E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JOSEPH DE LEON (Cal. Bar No. 313471)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-7280
     Facsimile: (213) 894-0141
     Email:    Joseph.De.Leon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　　　v.<br><br>MARC JESUS LOPEZ, et al.,<br><br>　　　　Defendants. | No. 2:23-cr-00126-FLA-2<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT JUAN NICHOLAS BENITEZ'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS; DECLARATION OF MICHAEL DINGILLO; DECLARATION OF YANNICK JACKSON; EXHIBITS<br><br>Hearing Date: October 20, 2023<br>Hearing Time: 10:30 a.m. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Joseph De Leon, hereby files its Opposition to Defendant JUAN NICHOLAS BENITEZ's Motion to Suppress Evidence and Statements (Dkt. 78).

//

//

//

1     This Opposition is based upon the attached memorandum of points

2 and authorities, the files and records in this case, and such further

3 evidence and argument as the Court may permit.

4 Dated: September 29, 2023     Respectfully submitted,

5     E. MARTIN ESTRADA
     United States Attorney

6

7     MACK E. JENKINS
     Assistant United States Attorney
     Chief, Criminal Division

8

9          /s/ Joseph De Leon
     JOSEPH DE LEON

10     Assistant United States Attorney

11     Attorneys for Plaintiff
     UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

**Contents**

TABLE OF AUTHORITIES.............................................ii

I.    INTRODUCTION..............................................1

II.   STATEMENT OF FACTS........................................2

III.  ARGUMENT.................................................8

      A.   The February 3, 2022 Investigatory Stop and Search Was
           Lawful..............................................8

           1.   Lopez's Actions Provided Reasonable Suspicion to
                Conduct an Investigatory Stop and Detain
                Defendant......................................8

           2.   Officer Jackson had Reasonable and Articulable
                Suspicion to Frisk Defendant..................11

           3.   Officer Jackson's Search of Defendant Did Not
                Exceed a Terry Frisk..........................13

           4.   Defendant's Detention Was a Terry Stop, Not An
                Arrest........................................14

           5.   Even if the Search of Defendant's Person Was
                Unlawful, Physical Evidence Recovered From the
                Dodge Should Not Be Suppressed................17

           6.   Even if the Search of Defendant's Person Was
                Unlawful, It Did Not Taint Defendant's Later
                Statements....................................20

           7.   Defendant's Statements Did Not Violate Miranda......21

           8.   By the Time Officers Took Defendant To the
                Station, They Had Probable Cause to Arrest
                Defendant.....................................22

      B.   February 7, 2022 Search of the Dodge Was Lawful..........23

           1.   Any Taint from the February 3, 2022 Search and
                Seizure Was Attenuated........................23

           2.   Good Faith Exception..........................25

IV.   CONCLUSION...............................................25

i

**TABLE OF AUTHORITIES**

**CASES**

Allen v. City of Los Angeles,
    66 F.3d 1052 (9th Cir. 1995) ................................ 16

Arizona v. Johnson,
    555 U.S. 323(2009) ........................................ 11

Brown v. Illinois,
    422 U.S. 590 (1975) ....................................... 20

California v. Acevedo,
    500 U.S. 565 (1991) ....................................... 19

Gallegos v. City of Los Angeles,
    308 F.3d 987(9th Cir. 2002) ............................... 15

Garvin v. Farmon,
    258 F.3d 951 (9th Cir. 2001) .............................. 20

Illinois v. Gates,
    462 U.S. 213 (1983) ....................................... 19

Illinois v. Wardlow,
    528 U.S. 119 (2000) ........................................ 8

Michigan v. Long,
    463 U.S. 1032 (1983) ...................................... 12

Minnesota v. Dickerson,
    508 U.S. 366 (1993) ....................................... 13

New York v. Quarles,
    467 U.S. 649 (1984) ....................................... 22

Robertson v. Pichon,
    849 F.3d 1173 (9th Cir. 2017) ............................. 21

Terry v. Ohio,
    392 U.S. 1 (1968) ......................................... 11

United States v. Allen,
    699 F.2d 453 (9th Cir. 1982) .............................. 21

United States v. Berber-Tinoco,
    510 F.3d 1083 (9th Cir. 2007) ............................. 10

United States v. Booth,
    669 F.2d 1231 (9th Cir. 1981) ............................. 21

United States v. Brady,
    819 F.2d 884 (9th Cir. 1987) .............................. 21

United States v. Brown,
         63 F. App'x 655 (4th Cir. 2003)................................10

United States v. Buckner,
         179 F.3d 834 (9th Cir. 1999)................................11

United States v. Buffington,
         815 F.2d 1292 (9th Cir. 1987)................................16

United States v. Burkett,
         612 F.3d 1103 (9th Cir. 2010)................................13

United States v. Cortez,
         449 U.S. 411 (1981).........................................8

United States v. Del Viso,
         918 F.2d 821 (9th Cir. 1990)................................17

United States v. Delgadillo-Velasquez,
         856 F.2d 1292 (9th Cir. 1988)................................17

United States v. Edwards,
         761 F.3d 977 (9th Cir. 2014)................................15

United States v. Garza,
         980 F.2d 546 (9th Cir. 1992)................................19

United States v. Guzman-Padilla,
         573 F.3d 865 (9th Cir. 2009)................................15

United States v. Hall,
         974 F.2d 1201 (9th Cir. 1992)................................12

United States v. Hill,
         No. CRIM. 14-276 ADM/SER, 2015 WL 4136222, at *4 (D. Minn.
         July 8, 2015)...............................................14

United States v. Huberts,
         637 F.2d 630 (9th Cir. 1980)................................17

United States v. Korte,
         918 F.3d 750 (9th Cir. 2019)................................19

United States v. LaChapelle,
         869 F.2d 488 (9th Cir. 1989)................................22

United States v. Leon,
         468 U.S. 897 (1984).........................................25

United States v. Merritt,
         695 F.2d 1263 (10th Cir. 1982)................................10

United States v. Miller,
         694 F. App'x 609 (9th Cir. 2017)................................18

United States v. Richards,
        500 F.2d 102 (9th Cir. 1974)..................................16

United States v. Ross,
        456 U.S. 798 (1982)........................................19

United States v. Ruckes,
        586 F.3d 713 (9th Cir. 2009)...............................18

United States v. Sandoval,
        390 F.3d 1077 (9th Cir. 2004)..............................10

United States v. Shareef,
        100 F.3d 1491 (10th Cir. 1996).............................10

United States v. Smith,
        790 F.2d 789 (9th Cir. 1986)...............................19

United States v. Sokolow,
        490 U.S. 1 (1989)...........................................9

United States v. Valentine,
        232 F.3d 350 (3d Cir. 2000)................................12

United States v. Villasenor,
        608 F.3d 467 (9th Cir. 2010)............................8, 13

United States v. Washington,
        387 F.3d 1060 (9th Cir. 2004)..............................24

United States v. Watson,
        423 U.S. 411 (1976)........................................22

United States v. Wright,
        582 F.3d 199 (1st Cir. 2009)...............................12

United States v. Zapien,
        861 F.3d 971 (2017)........................................21

Utah v. Strieff,
        579 U.S. 232 (2016)........................................24

Washington v. Lambert,
        98 F.3d 1181 (9th Cir. 1996)...............................15

Wong Sun v. United States,
        371 U.S. 471 (1963)........................................17

Wyoming v. Houghton,
        526 U.S. 295 (1999)........................................11

Ybarra v. Illinois,
        444 U.S. 85 (1979).........................................10

**STATUTES**

18 U.S.C. § 922...............................................1

**OTHER AUTHORITIES**

Cal. Penal Code § 3453.........................................18

# I.   INTRODUCTION

On January 31, 2022, co-defendant Marc Jesus Lopez ("Lopez") carjacked J.S. at gunpoint, which J.S. immediately reported to the Los Angeles Police Department ("LAPD").  On February 3, 2022, Officers Cunningham and Dingillo spotted Lopez and two other individuals, later identified as defendant Juan Nicholas Benitez ("defendant") and E.G., sitting in Lopez's black Dodge Sedan (the "Dodge") parked outside of Lopez's residence.  As soon as the officers parked behind the Dodge, Lopez exited the vehicle and dared the officers to shoot him.  After Lopez was detained and backup officers arrived, officers ordered defendant and E.G. out of the Dodge at gunpoint and ordered them to lay on their stomachs.  Officer Jackson later frisked defendant and found two bullets in defendant's pocket.  Given that Lopez was on Parole/Post-Release Community Supervision ("PRCS") (which included search and seizure conditions), Officer Dingillo then conducted a probation search of the Dodge and, among other things, found two loaded firearms under the driver's seat and two rounds of ammunition in a pair of jeans in the rear passenger seat.  On February 7, 2022, law enforcement again searched the Dodge, this time pursuant to a state search warrant, and found two hidden high-capacity magazines that contained 45 9mm rounds.

For the ammunition recovered on February 3, 2022 and February 7, 2022, defendant was charged with being a prohibited person in possession of ammunition, in violation of 18 U.S.C. § 922(g)(9).  On September 13, 2023, defendant filed a motion to suppress all the evidence against him on the grounds that the evidence was purportedly tainted by a Fourth Amendment violation.  (See Dkt. 78 ("Mot.").)  Defendant argues that at the moment the officers pointed their

1

weapons at the Dodge and ordered defendant and E.G. out of the vehicle, the officers did not have reason to believe that defendant and E.G. were involved in the carjacking, or that they had committed any other crime.  As such, defendant claims that the fruits of the searches and all subsequent evidence must be suppressed, including defendant's statements.

Defendant's claims are meritless.  *First,* because Lopez carjacked a vehicle at gunpoint a few days before, officers still had reasonable suspicion to believe that defendant, who was still in the Dodge, was armed and dangerous.  *Second*, Officer Jackson's pat-down of defendant did not exceed a Terry frisk because Officer Jackson immediately recognized that there was ammunition in defendant's pocket.  *Third*, defendant's detention was a Terry stop, not an arrest, because the restrictions placed on defendant were supported by the officers' need to ensure their own safety.  *Fourth*, even if Officer Jackson's frisk of defendant was unlawful (it was not), officers would have inevitably discovered the firearms and ammunition in the Dodge by lawful means.  Finally, defendant's unmirandized statements were both spontaneous and voluntary, and also were covered by the public safety exception.  In sum, both the Terry stop and Officer Jackson's frisk of defendant were lawful, and the Court should deny the motion to suppress.

## II.  STATEMENT OF FACTS

On January 31, 2022, J.S. arrived at co-defendant Lopez's mother's house to drop off her and Lopez's daughter.  (Def. Ex. C at

$2^1$.)  After she dropped off her daughter and returned to her car, Lopez entered the front passenger seat and told J.S. to take him to a park to pick up his vehicle.  (Def. Ex. B at 2.)  When J.S. refused, Lopez pointed a black handgun at J.S. and pushed her out of the car. (Id.)  Lopez then drove off with J.S.'s vehicle eastbound on Iowa Avenue from Colby Avenue.  (Id.)  J.S. went to a nearby LAPD station and reported that Lopez had taken her vehicle at gunpoint.  (Id.) LAPD officers searched the area for Lopez but did not find him. (Id.)  On February 1, 2022, J.S. tracked her cellphone, which was inside her vehicle, and found her unoccupied, parked vehicle.  (Def. Ex. C at 2.)  LAPD officers searched J.S.'s vehicle for Lopez's firearm but did not find it. (Id.)

On February 3, 2022, LAPD officers confirmed Lopez's PRCS status (which included search and seizure conditions) with Lopez's probation officer.  (Def. Ex. C at 3.)  At the outset of their shift and in preparation for a probation compliance check at Lopez's residence, Officers Cunningham and Dingillo were briefed that on January 31, 2022, Lopez had carjacked J.S. at gunpoint.  (Declaration of Michael Dingillo ("Dingillo Decl.") ¶ 3.)  Officers Cunningham and Dingillo were further briefed that Lopez was armed and dangerous and were provided with a description and photo of Lopez.  (Id.)

At approximately 6:15 p.m., LAPD Officers Cunningham and Dingillo attempted to conduct a probation compliance check at Lopez's home.  (Id. ¶ 4.)  However, a woman answered the door and told the officers that Lopez was not home, and refused to allow the officers

---

[1] Any page numbers indicated for defendant's exhibits are to the same page numbers stamped by the ECF system in the top header of the defendant's filed exhibits.

1    entry into the residence.  (Id.)  The officers decided to disengage
2    from the residence but continued to conduct patrol in the area. (Id.)
3        At approximately 7:05 p.m., Officers Cunningham and Dingillo
4    were conducting patrol in the area of Colby Avenue and Iowa Avenue
5    when they observed Lopez seated in the driver's seat of a black Dodge
6    sedan parked outside of Lopez's residence.  (Id. ¶ 5.)  A man, later
7    identified as defendant, sat in the front passenger seat and a woman,
8    later identified as E.G., sat in the back passenger seat.  (Id.)  The
9    officers then parked behind the Dodge and engaged the patrol car's
10   forward facing red and blue lights.  (Id. ¶ 6.)  Lopez then suddenly
11   stepped out of the driver's seat and began walking towards the LAPD
12   officers.  (Id.; Def. Ex. D at 1:53-1:54.)  Because Lopez was a
13   suspect for a violent crime and known to be armed, Officer Dingillo
14   immediately requested backup, an airship, and a supervisor.
15   (Dingillo Decl. ¶ 6.)
16       Officer Cunningham then ordered Lopez to get on his stomach and
17   cooperate.  (Dingillo Decl. ¶ 6; Def. Ex. D at 1:59-2:33 (Officer
18   Cunningham stating "get on your stomach now" and "quit playing
19   around" and "just cooperate man").)  Lopez refused to comply with
20   Officer Cunningham's demands, told the officers to shoot him, and
21   dared the officers to shoot him.  (Dingillo Decl. ¶ 6; Def. Ex. D at
22   2:34-3:12 (Lopez stating "shoot me, I don't care" and "shoot me, I
23   dare you").)  Officer Cunningham then approached Lopez and put him on
24   the ground.  (Dingillo Decl. ¶ 7; Def. Ex. D at 3:11-3:17.)  Officer
25   Dingillo assisted Officer Cunningham in handcuffing Lopez.  (Dingillo
26   Decl. ¶¶ 6-7; Def. Ex. D at 3:17-3:47.)  While handcuffing Lopez with
27   one arm, Officer Dingillo kept his firearm aimed at the Dodge because
28   there were still occupants in the vehicle and they remained a threat

1  to the safety of the officers.  (Dingillo Decl. ¶ 7.)  Officer

2  Dingillo also reminded the backup officers that there were still

3  people in the Dodge, and that Lopez was known to carry a firearm.

4  (Dingillo Decl. ¶ 8; Def. Ex. D at 3:27-3:41).  Lopez was then placed

5  under arrest for carjacking in violation of California Penal Code

6  Section 215.  (Dingillo Decl. ¶ 11.)

7      Thereafter, defendant and E.G. failed to comply with Officer

8  Cunningham's five separate requests to get out of the Dodge, and it

9  wasn't until the Officer's sixth request that they finally got out of

10  the Dodge.  (Dingillo Decl. ¶ 9; Def. Ex. D at 4:29-7:11.)  E.G. and

11  defendant then exited the vehicle and laid on their stomachs in the

12  middle of the street.  (Dingillo Decl. ¶ 9; Def. Ex. D. at 7:40,

13  8:50.)  Officers then continued to aim their firearms at the Dodge

14  and Officer Cunningham again stated that "they" are known to be

15  armed.  (Def. Ex. D. at 10:15-53.)

16      Because Lopez's residence was to the right of the Dodge, before

17  Officer Dingillo approached the Dodge, he requested that other

18  officers cover his right flank to watch Lopez's residence.  (Dingillo

19  Decl. ¶ 9; Ex. 1 at 9:10-9:22.)  The officers then walked towards the

20  vehicle with their firearms out and confirmed that there were no

21  other occupants inside the Dodge.  (Dingillo Decl. ¶ 9; Ex. 1 at

22  9:21-9:50.)  Officer Dingillo continued to maintain a visual on

23  Lopez's residence while holding up his firearm to protect the safety

24  of the other officers.  (Dingillo Decl. ¶ 9; Gov. Ex. 1 at 9:50-

25  10:50.)

26      An officer then approached defendant, who was on his stomach,

27  and handcuffed the defendant and stood him up, after which Officer

28  Jackson took the defendant to the side of his patrol car.  (Def. Ex.

E at 7:30-8:21; Declaration of Officer Yannick Jackson ("Jackson Decl.") ¶ 4.)  An officer told Officer Jackson that they were taking defendant to the police station, but before putting defendant in a patrol car, Officer Jackson conducted a pat-down search and found two 9mm rounds of ammunition in defendant's front left cargo shorts pocket.  (Jackson Decl. ¶¶ 4, 8.)  In addition, in response to Officer Jackson's question as to whether there were firearms in the Dodge, defendant told Officer Jackson that there could be firearms in the Dodge.  (Id. ¶ 9.)  Another officer then approached Officer Jackson, and Officer Jackson told that officer that defendant had ammo, which prompted defendant to voluntarily state, "yea I had seen them on the floor."  (Def. Ex. G at 25:00-25:12.)  The officer then conducted a second frisk of the defendant and proceeded to place him in the back of a police car.  (Def. Ex. G. at 25:12-26:46.)  In response to an officer's question as to where the gun was, defendant said that he did not know and that he found the bullets on the floor and put them in his pocket.  (Def. Ex. G at 27:17-27:25.)

Officer Dingillo confirmed with Detective Espinoza that Lopez was on probation and subject to search and seizure conditions.  (Dingillo Decl. ¶ 13; Gov. Ex. 1 at 18:22-18:50.)  Officer Dingillo then conducted a probation search of the Dodge and found: (1) a zip-lock bag containing 43.09 grams of suspected methamphetamine in the driver's door panel; (2) two loaded firearms located underneath the driver's seat, each with one round in the chamber and additional rounds in the magazine; (3) a glass pipe with a bulbous end between the driver's seat and center console; (4) two small baggies containing suspected methamphetamine on the rear right floorboard; and (5) two rounds of 9mm ammunition inside the left pants pocket of

1  a pair of jeans in the rear passenger seat.  (Dingillo Decl. ¶ 13).
2  In total, there were 16 rounds of ammunition which included the 12
3  rounds found in the two loaded firearms, two rounds found in the pair
4  of jeans in the rear passenger seat, and two rounds found in the
5  defendant's pocket.  (Def. Ex. B at 4.)

6      Lopez, defendant, and E.G. were then transported to the police
7  station where they were each questioned separately.  (Def. Ex. C at
8  3.)  Detective Espinoza *Mirandized* defendant, and defendant stated
9  that he understood his rights, waived them, and agreed to provide a
10  statement to Detective Espinoza.  (Id. at 4.)  Defendant then
11  admitted to having two rounds of ammunition in his pocket and stated
12  that both guns in the vehicle belonged to Lopez.  (Id. at 4.)  In
13  response to Detective Espinoza's question as to whether defendant
14  knew where the guns were found in the Dodge, defendant replied,
15  "[w]here I told them . . . under the seat.  The driver seat." (Id.)
16  Defendant was then released.  (Id.)

17      On February 4, 2022, in a recorded jail call, Lopez asked the
18  defendant whether the officers found the "extendis," referring to
19  extended pistol magazines.  (Id. at 5.)  Defendant responded "[n]ah,
20  the extendis are still in your whip." (Id.)  Lopez also told
21  defendant that he should have hidden one of the guns in the "spot"
22  and taken apart the other gun.  (Id.)

23      Detective Espinoza then obtained a California state search
24  warrant for the Dodge on February 7, 2022.  (Id. at 8.)  Detective
25  Espinoza searched the Dodge pursuant to the search warrant and found
26  two black high-capacity magazines hidden in the bottom back
27  compartment of the center console.  (Id.)  The magazines contained a
28  total of 45 9mm rounds.  (Id.)

III. **ARGUMENT**

To be clear, this case concerns defendant's possession and law enforcement's seizure of 61 rounds of ammunition on two <u>separate</u> days -- 16 rounds that were seized on February 3, 2022, and 45 rounds that were seized on February 7, 2022.  Yet, defendant's motion solely focuses on the searches and seizures of February 3, 2022, ignores the events of February 7, 2022, and then, in summary fashion, asks the court to suppress "all evidence following from the seizure of his person" (which took place on February 3, 2022).  (Mot. at 9.)  In other words, defendant does not meaningfully raise or address the relevant legal issues outside of February 3, 2022.  Through this response, the government provides clarity regarding those issues by distinguishing between the dates, conduct, and legal theories.

> **A. The February 3, 2022 Investigatory Stop and Search Was Lawful**
>
> > 1. <u>Lopez's Actions Provided Reasonable Suspicion to Conduct an Investigatory Stop and Detain Defendant</u>

An officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  <u>Illinois v. Wardlow</u>, 528 U.S. 119 (2000).  To determine whether a seizure was justified by reasonable suspicion, a court must consider whether, in light of the totality of the circumstances, the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981).

Courts are to consider the evidence as a whole, not piece by piece.  <u>United States v. Villasenor</u>, 608 F.3d 467, 473 (9th Cir. 2010).  An officer is permitted to "draw on [his] own experience and specialized training to make inferences from and deductions about the

1  cumulative information available . . . that might well elude an

2  untrained person."  United States v. Sokolow, 490 U.S. 1, 7 (1989).

3       Here, officers had ample reasonable suspicion to conduct an

4  investigatory stop and detain defendant for several reasons.  First,

5  at the beginning of their shift, Officers Cunningham and Dingillo had

6  been briefed that Lopez had carjacked the mother of his child at

7  gunpoint a few days earlier and that he was known to be armed and

8  dangerous.  (Dingillo Decl. ¶ 3.)  For this reason, when the officers

9  first spotted Lopez sitting in the Dodge with passengers, Officer

10 Dingillo immediately requested backup, an airship, and a supervisor

11 to assist with detaining Lopez and the passengers.  (Id. ¶ 6.)

12      Second, as soon as the officers parked behind the Dodge, Lopez,

13 a suspect known to be armed, exited the vehicle, walked towards the

14 officers, and dared them to shoot him.  (Dingillo Decl. ¶ 6; Def. Ex.

15 D at 2:34-3:12.)  Third, Lopez refused to follow Officer Cunningham's

16 orders to get on his stomach.  (Def. Ex. D at 2:34-3:12.)

17      Fourth, Lopez's residence, where Officers Cunningham and

18 Dingillo had previously been refused entry earlier that day, was to

19 the right of the Dodge.  (Dingillo Decl. ¶ 9.)  Officers continued to

20 maintain a visual on Lopez's residence to ensure officer safety.

21 (Id.)  Fifth, before Lopez stepped out of the Dodge, it was possible

22 that Lopez, known to be armed, could have given his weapon to the

23 passengers to conceal or use.[2]  (Id. ¶ 7.)  Indeed, given that

24 possibility, officers continued to aim their firearms at the Dodge

25 and repeatedly stated that Lopez was known to be armed.  (Id. ¶ 8;

26

27        [2] This suspicion was corroborated when Lopez later called
   defendant on February 4, 2022 and stated that defendant should have
28 hidden one of the guns in the "spot" and taken apart the other gun.
   (Def. Ex. C at 5.)

                                9

Def. Ex. D at 3:27-3:41).  Sixth, the passengers failed to comply with Officer Cunningham's five separate requests to get out of the Dodge.  (Def. Ex. D at 4:29-7:11.)

These facts, taken together, provided a "particularized and objective basis for suspecting [defendant] of criminal activity," United States v. Berber-Tinoco, 510 F.3d 1083, 1087 (9th Cir. 2007), and raised sufficient reasonable suspicion to detain defendant for investigatory purposes.  See, e.g., United States v. Sandoval, 390 F.3d 1077, 1080-81 (9th Cir. 2004) (stating that "refusal to obey the officers' commands" is among the permissible considerations when determining whether reasonable suspicion exists); United States v. Brown, 63 F. App'x 655, 656-57 (4th Cir. 2003) (the driver immediately exiting the vehicle and ignoring repeated commands contributed to the justified belief that the passenger was dangerous);  United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982) (information that the suspect should be considered armed justifies suspicion that suspect and unidentified companions may be armed).

Defendant's reliance on Ybarra v. Illinois, 444 U.S. 85 (1979) is inapposite.  There, (1) officers had no reason to believe there was a connection between the customer and the proprietor of the tavern other than the customer's presence in the tavern, and (2) because of the bright lighting in the tavern, officers were able to observe that the customer's hands were empty and posed no threat to the officers' safety.  Id. at 93.  In contrast, defendant was in the **same vehicle** as Lopez (at night), which suggested they had been traveling together.  See, e.g., United States v. Shareef, 100 F.3d 1491, 1506 (10th Cir. 1996) (distinguishing Ybarra on account that "police confronted the defendants in their cars at night").  This is

significant because, as the Supreme Court noted in <u>Wyoming v. Houghton</u>, 526 U.S. 295, 304-05 (1999), "[a] car passenger—unlike the unwitting tavern patron in <u>Ybarra</u> — will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing."

To be sure, the Ninth Circuit has distinguished the "mere presence" doctrine in <u>Ybarra</u> from cases where the "facts and circumstances ... support an inference that [an] individual is connected to the proximate criminal activity." <u>United States v. Buckner</u>, 179 F.3d 834, 839 (9th Cir. 1999). Here, because Lopez could have handed his firearm to defendant, who was in the same vehicle as Lopez, and in light of defendant's refusal to comply with five separate requests from law enforcement to exit the Dodge, officers had reasonable suspicion to believe defendant was engaged in criminal activity.[3]

    2.   <u>Officer Jackson had Reasonable and Articulable Suspicion to Frisk Defendant</u>

Once defendant got out of the Dodge and was handcuffed, Officer Jackson was justified in performing a pat-down search of defendant for weapons and contraband.

"[A] limited search of outer clothing for weapons" during an investigatory stop is reasonable under the Fourth Amendment. <u>Arizona v. Johnson</u>, 555 U.S. 323, 330 (2009); <u>see also</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 24 (1968). A lawful pat-down must be based on "'specific and

_____

[3] Defendant's reliance on <u>United States v. Di Re</u>, 332 U.S. 581 (1948), which the court in <u>Ybarra</u> relied on, is equally unpersuasive. There, officers were investigating counterfeit gasoline ration coupons and had no reason to believe that Di Re was armed and dangerous. <u>Id.</u> at 583. In contrast, defendant was in the same car with Lopez, an individual known to have carjacked a vehicle at gun point a few days before the stop.

articulable facts, which . . . reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." <u>Michigan v. Long</u>, 463 U.S. 1032, 1049 (1983) (quoting <u>Terry</u>, 392 U.S. at 21).  To determine whether reasonable suspicion existed, courts consider the "totality of the circumstances surrounding the stop," as well as the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." <u>United States v. Hall</u>, 974 F.2d 1201, 1204 (9th Cir. 1992).

Here, Officers Dingillo and Cunningham formed a reasonable and articulable suspicion that defendant could be armed and dangerous for several reasons.  First, as described above, defendant had been in the vehicle with Lopez, a known armed suspect for carjacking.  As such, Officer Dingillo had reason to believe that Lopez could have left the firearm in the Dodge when he got out of the car, and/or given defendant the firearm.  (Dingillo Decl. ¶ 7.)  Second, defendant failed to comply with Officer Cunningham's five separate requests to get out of the Dodge, and it was not until the Officer's sixth request that defendant got out of the Dodge.  (Def. Ex. D at 4:29-7:11.)  These facts, taken together, provided Officers Cunningham and Dingillo with reasonable suspicion that defendant was armed and dangerous.  <u>See</u> <u>United States v. Wright</u>, 582 F.3d 199, 212 (1st Cir. 2009) (finding that refusal to comply with officers' orders contributes to reasonable suspicion); <u>United States v. Valentine</u>, 232 F.3d 350, 358-59 (3d Cir. 2000) (citing cases finding failure to comply with police orders supported reasonable suspicion).

Importantly, reasonable suspicion that an individual is armed and dangerous may arise from "the collective knowledge of the

12

officers involved."  United States v. Burkett, 612 F.3d 1103, 1107
(9th Cir. 2010); see also United States v. Villasenor, 608 F.3d 467,
475 (9th Cir. 2010) ("[C]ourts [can] impute police officers'
collective knowledge to the officer conducting a stop, search or
arrest" if (1) "law enforcement agents are working together in an
investigation but have not explicitly communicated the facts each has
independently learned," or (2) "an officer . . . with direct personal
knowledge of all the facts necessary to give rise to reasonable
suspicion . . . directs or requests that another officer . . .
conduct a stop, search or arrest.").

In this case, the Court should impute Officers Dingillo's and
Cunningham's knowledge and reasonable suspicion to Officer Jackson,
particularly since they told Officer Jackson that defendant was going
to be taken to the police station.  (Jackson Decl. ¶ 4.)  Based on
their knowledge and his own knowledge, Officer Jackson was then
justified in frisking defendant before putting him in a police
vehicle and taking him to the police station.

### 3.  Officer Jackson's Search of Defendant Did Not Exceed a Terry Frisk

Terry permits a police officer to perform a limited search, even
without probable cause, "for the discovery of weapons which might be
used to harm the officer or others nearby."  Terry, 392 U.S. at 26.
"If an officer lawfully pats down a suspect's outer clothing and feels
an object whose contour or mass makes its identity *immediately apparent*,
there has been no invasion of the suspect's privacy beyond that already
authorized by the officer's search for weapons."  Minnesota v.
Dickerson, 508 U.S. 366, 367 (1993) (emphasis added).

13

Defendant argues that "[a]n officer properly frisking Mr. Benitez's outer clothing could not have 'immediately' determined that he possessed two 9mm bullets." (Mot. 12.)  However, defendant fails to take into account that Officer Jackson regularly handles ammunition in the course of his job and is familiar with putting bullets in his own pockets. (Jackson Decl. ¶¶ 7-8.)  Therefore, when Officer Jackson frisked defendant, Officer Jackson could immediately recognize the ammunition-filled pocket without the manipulation or probing proscribed by Dickerson.  See, e.g., United States v. Hill, No. CRIM. 14-276 ADM/SER, 2015 WL 4136222, at *4 (D. Minn. July 8, 2015) (stating that the officer's pat-down of defendant's pocket to discover 9mm ammunition did not exceed the scope of a Terry frisk because the officer was able to immediately identify the ammunition in defendant's pocket).

Additionally, defendant goes so far as to state that "[b]ullets are neither weapons nor contraband" to suggest that two bullet-like objects in someone's pocket do not establish the presence of anything incriminating. (Mot. at 12.)  However, defendant ignores what bullets are designed for.  Bullets only serve one purpose – to be used in a firearm.  Therefore, not only are bullets themselves incriminating, they also suggests that a firearm may be present. Indeed, as officers later discovered, there were two firearms under the driver's seat. (Dingillo Decl. ¶ 13.)

4.   Defendant's Detention Was a Terry Stop, Not An Arrest

Defendant argues that the officers' seizure of defendant was an arrest, rather than a Terry stop.  Not so.  Officers used reasonable measures for officer safety to detain defendant, which they were entitled to do without transforming the encounter into an arrest.

1    "The totality of the circumstances determines whether and when
2    an investigatory stop becomes an arrest."  United States v. Edwards,
3    761 F.3d 977, 981 (9th Cir. 2014).  In making this evaluation, the
4    Ninth Circuit instructs courts to consider two factors.  Id.  First,
5    a court must analyze "the intrusiveness of the stop, i.e., the
6    aggressiveness of the police methods and how much the [person's]
7    liberty was restricted."  Id. (quoting Washington v. Lambert, 98 F.3d
8    1181, 1185 (9th Cir. 1996)).  This first prong is considered from the
9    perspective of the person seized.  Edwards, 761 F.3d at 981.

10   However, the inquiry does not end there.  The second prong is
11   analyzed from the perspective of the officer, "bearing in mind that
12   'the purpose of a Terry stop is to allow the officer to pursue his
13   investigation without fear of violence.'"  Edwards, 761 F.3d at 981
14   (quoting United States v. Guzman-Padilla, 573 F.3d 865, 884 (9th Cir.
15   2009)).  Thus, the Court must not only consider how intrusive the
16   stop was, but whether "the methods used were reasonable given the
17   circumstances."  Lambert, 98 F.3d at 1185.  "The second inquiry
18   frequently proves determinative."  Guzman-Padilla, 573 F.3d at 884.

19   Defendant improperly suggests that because officers ordered
20   defendant out of the vehicle, ordered him to the ground at gunpoint,
21   handcuffed him, and frisked him, this made the seizure an arrest.
22   (Mot. at 6-7.)  But Ninth Circuit jurisprudence has "made clear that
23   an investigative detention does not automatically become an arrest
24   when officers draw their guns" or use handcuffs.  Gallegos v. City of
25   Los Angeles, 308 F.3d 987, 991 (9th Cir. 2002).  That is why the
26   Ninth Circuit consistently upholds Terry stops where suspects were
27   unequivocally not free to end the encounter, including when they are
28   ordered out of their vehicles at gunpoint, handcuffed, and placed in

1  the back of patrol cars.  See, e.g., Gallegos, 308 F.3d at 991-92;

2  Washington, 98 F.3d at 1186; United States v. Buffington, 815 F.2d

3  1292, 1300 (9th Cir. 1987); Edwards, 761 F.3d at 982.

4      Here, the restrictions placed on defendant were supported by the

5  officers' need to investigate the crime and ensure their own safety.

6  As described above (supra, Part III. A.1), the following

7  circumstances supported the officer's actions:

8  • Officers knew Lopez had carjacked a vehicle at gunpoint and was

9    armed and dangerous (Dingillo Decl. ¶ 3);

10 • Lopez exited the vehicle, walked towards police officers, and

11   dared the officers to shoot him (Def. Ex. D at 2:34-3:12);

12 • Lopez could have passed the gun to defendant to conceal or use

13   the gun (Dingillo Decl. ¶ 7);

14 • Defendant failed to comply with Officer Cunningham's first five

15   requests to exit the vehicle (Def. Ex. D at 4:29-7:11); and

16 • Lopez's nearby residence posed a threat (Dingillo Decl. ¶ 9).

17      Therefore, officers were justified in temporarily restraining

18 defendant and doing so did not convert the detention to an arrest.

19 See, e.g., Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir.

20 1995) ("Pointing a weapon at a suspect, ordering him to lie on the

21 ground, handcuffing him, and placing him for a brief period in a

22 police vehicle for questioning--whether singly or in combination--

23 does not automatically convert an investigatory detention into an

24 arrest requiring probable cause.").  To be sure, defendant was never

25 told he was under arrest, which is significant.  See United States v.

26 Richards, 500 F.2d 1025, 1029 (9th Cir. 1974) ("[While] an arrest can

27 be made without the use of such words, the absence of such words as

28

                                    16

well as the officer's actions indicate that [defendant] was merely
detained for investigative questioning and not placed under arrest.")

Defendant's cited authority, United States v. Delgadillo-
Velasquez, 856 F.2d 1292 (9th Cir. 1988) and United States v. Del
Viso, 918 F.2d 821 (9th Cir. 1990) are distinguishable.  In
Delgadillo-Velaz, agents immediately told the defendant he was under
arrest, whereas the defendant here was never told he was under arrest
and was released after questioning.  856 F.2d at 1297.  Similarly, in
Del Viso, the court stated there was no evidence that Del Viso failed
to comply with police orders, whereas defendant failed to comply with
Officer Cunningham's first five requests to get out of the Dodge. 918
F.2d at 825.  Accordingly, defendant's detention was a Terry stop,
not an arrest.

> 5. Even if the Search of Defendant's Person Was Unlawful,
>    Physical Evidence Recovered From the Dodge Should Not
>    Be Suppressed

Under the "fruit of the poisonous tree" doctrine, evidence
obtained as a direct result of an illegal search is barred by the
exclusionary rule.  United States v. Huberts, 637 F.2d 630, 638 (9th
Cir. 1980) (citing Wong Sun v. United States, 371 U.S. 471, 488-89
(1963)).  Defendant claims that because Officer Jackson unlawfully
searched defendant (he did not), "all evidence against Mr. Benitez is
tainted by the Fourth Amendment violation."  (See Mot. at 13.)  To be
sure, this would include the 12 rounds of ammunition found in the two
loaded firearms in the Dodge and the 2 rounds found in the pair of
jeans in the rear passenger seat.  (Def. Ex. B at 4.)

However, the "fruit of the poisonous tree" doctrine does not
apply because of the "inevitable discovery" exception.  This
exception allows the government to "rely on evidence that ultimately

17

would have been discovered absent a constitutional violation."
United States v. Ruckes, 586 F.3d 713, 718 (9th Cir. 2009).  If the
government can show by a preponderance of the evidence that the
evidence "ultimately or inevitably would have been discovered by
lawful means . . . the evidence should be received."  Id.  Here, the
officers would inevitably have searched the Dodge for firearms
because: (1) the officers knew that Lopez was armed and had recently
carjacked a victim at gunpoint; (2) the officers knew that Lopez was
on PRCS and subject to search and seizure conditions; and (3) there
was probable cause to believe the Dodge contained evidence of a
crime.[4]  In other words, given the circumstances leading up to
Lopez's detention, there is no doubt that the officers would have
searched the Dodge for evidence of the carjacking, regardless of the
bullets found in defendant's pocket.  Thus, the fruit of the
poisonous tree doctrine does not apply to the firearms and ammunition
found in the Dodge.

> a.   *Officers Knew Lopez Had PRCS Conditions*

Officers are authorized to search an individual and the
individual's property with or without probable cause, if that person
is subject to PRCS, as long as the officers are aware that the person
is subject to PRCS.  See Cal. Penal Code § 3453(f) ("The person [on
PRCS], and their residence and possessions, shall be subject to
search at any time of the day or night, with or without a warrant, by
an agent of the supervising county agency or by a peace officer.");
United States v. Miller, 694 F. App'x 609, 610 (9th Cir. 2017)
(noting that "California appellate courts have likened PRCS to

---

[4] In addition, four days later, Detective Espinoza lawfully
searched the Dodge pursuant to a state search warrant.

parole" and holding that officers who know of defendant's PRCS conditions may search property under his control).

Here, LAPD officers knew Lopez was on PRCS.  (Def. Ex. C at 3.; Dingillo Decl. ¶ 13.)  Therefore, the officers were legally permitted to search Lopez's Dodge without a warrant.  See United States v. Korte, 918 F.3d 750, 754 (9th Cir. 2019).

### b. Officers Had Probable Cause to Believe that the Dodge Contained Evidence of a Crime

The automobile exception to the Fourth Amendment warrant requirement grants police officers authority to search a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime.  See California v. Acevedo, 500 U.S. 565, 580 (1991).  Probable cause for a search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).  As with reasonable suspicion, determination of probable cause is based on the "totality of the circumstances" known collectively to the deputies. United States v. Smith, 790 F.2d 789, 792 (9th Cir. 1986).  Moreover, "law enforcement officers may draw upon their experience and expertise in determining the existence of probable cause." United States v. Garza, 980 F.2d 546, 550 (9th Cir. 1992).  And, where police have probable cause to search a car, they may search all compartments, containers, and packages within the vehicle.  United States v. Ross, 456 U.S. 798, 821 & n.28 (1982).

Here, officers had been informed at the start of their shift that Lopez had carjacked J.S. days earlier at gunpoint.  Further, when officers encountered Lopez outside of his home in the Dodge, he acted erratically, failed to comply with the officers' orders, and

dared the officers to shoot him.  Based on all these facts, there was probable cause to believe that there was evidence of the carjacking, namely the firearm used by Lopez, in the Dodge.

> 6.   Even if the Search of Defendant's Person Was Unlawful, It Did Not Taint Defendant's Later Statements

Defendant next argues that his purportedly unlawful search tainted statements made to law enforcement officers on February 3, 2022.  (Mot. at 13.)  Not so.  The causal chain between the taint of the arrest and subsequent statements is "broken" where the subsequent statements were voluntary and "'sufficiently an act of free will to purge the primary taint.'"  Brown v. Illinois, 422 U.S. 590, 602 (1975) (citation omitted).  To determine whether that is so, the court must consider whether a Miranda warning was given, the temporal proximity of the unlawful arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct.  Garvin v. Farmon, 258 F.3d 951, 956 (9th Cir. 2001).

Here, before being taken to the station, the defendant voluntarily admitted to finding bullets on the floor and did so after interrupting Officer Jackson's conversation with another officer. (Def. Ex. G at 25:00-25:12.)  In addition, defendant voluntarily told Officer Jackson that there could be firearms in the Dodge.  (Jackson Decl. ¶ 9.)  There was no flagrant government misconduct, as officers diligently processed defendant and took him to the station for questioning.  (Def. Ex. C at 3.)  Thus, any taint was purged.

As for statements made at the station, these statements were made about an hour and fifty minutes later when defendant was taken to the station, and after defendant waived his Miranda rights. Therefore, any taint was purged as to these statements as well.

7.   <u>Defendant's Statements Did Not Violate Miranda</u>

While defendant was detained, defendant made several statements in which he admitted to possessing two bullets in his pocket and to guns being in the Dodge.  These statements were spontaneous and voluntary, and fell within the public safety exception to <u>Miranda</u>.

        *a.   Defendant's Spontaneous and Voluntary Statements*
              *to LAPD Officers Are Admissible*

For <u>Miranda</u> protections to apply, as defendant contends, it is not enough for a suspect to simply be taken into custody – he must also be subjected to interrogation.  <u>Robertson v. Pichon</u>, 849 F.3d 1173, 1184 (9th Cir. 2017).  "Interrogation" means "any words or actions on part of police (other than those normally attendant to arrest and custody) that officers should know are reasonably likely to elicit an incriminating response."  <u>United States v. Zapien</u>, 861 F.3d 971, 974-75 (2017).

By contrast, spontaneous or volunteered statements of a suspect in custody are admissible, even where <u>Miranda</u> warnings are absent. <u>United States v. Booth</u>, 669 F.2d 1231, 1237 (9th Cir. 1981).  Here, when Officer Jackson told another officer that defendant had ammo in his pocket, defendant spontaneously interjected, "yea I had seen them on the floor."  (Def. Ex. G at 25:00-25:12.)  Accordingly, this spontaneous and voluntary statement is admissible even without a <u>Miranda</u> warning.  <u>See</u>, <u>e.g.</u>, <u>United States v. Allen</u>, 699 F.2d 453, 459-60 (9th Cir. 1982).

        *b.   Defendant's Statements Fell Within the Public*
              *Safety Exception*

The officer's question to the defendant about the presence of guns in the Dodge fell within the public safety exception.  <u>See</u> <u>United States v. Brady</u>, 819 F.2d 884, 888 (9th Cir. 1987) (officer

entitled to ask whether guns in car).  "[Questions] reasonably prompted by a concern for the public safety" are permissible without Miranda warnings.  New York v. Quarles, 467 U.S. 649, 656 (1984). Accordingly, because defendant's statement that there could be firearms in the Dodge were made in response to Officer Jackson's question as to whether there were firearms in the Dodge, this statement is admissible even without Miranda warnings.  (Def. Ex. C at 3; Jackson Decl. ¶ 9.).  Likewise, defendant's admission that he found the bullets on the floor and put them in his pocket, which was made in response to the same question from another officer, is admissible without Miranda warnings.  (Def. Ex. G at 27:17-27:25.)

8.   By the Time Officers Took Defendant To the Station, They Had Probable Cause to Arrest Defendant

The officers had probable cause to arrest defendant by the time they took him to the station.  During the search of the Dodge, Officer Dingillo found more than 40 grams of suspected methamphetamine and two loaded firearms.  (Dingillo Decl. ¶ 13).

At this point, nobody claimed possession of the methamphetamine. Therefore, officers, at a minimum, had probable cause to arrest defendant for the suspected methamphetamine.

For an arrest to be lawful, it must be based on probable cause. United States v. Watson, 423 U.S. 411, 418 (1976).  "The test for probable cause is whether facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  United States v. LaChapelle, 869 F.2d 488, 490 (9th Cir. 1989) (internal punctuation omitted).

In <u>Maryland v. Pringle</u>, the defendant was the passenger in a vehicle with two others; police officers pulled them over and discovered cocaine in the rear seat of the vehicle and a large amount of cash in the glove box in front of the defendant. 540 U.S. 366, 371–72 (2003). Each of the occupants claimed that the contraband did not belong to them, so officers arrested all three occupants; the defendant challenged the probable cause for his arrest. <u>Id.</u> The Court rejected defendant's challenge and explained that it was "an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly." <u>Id.</u> At 372.

Here, officers found over 40 grams of suspected methamphetamine in the driver's door panel, that, moments before the search, had been in the Dodge with Lopez, defendant, and E.G. (Def. Ex. B at 4.) Defendant was in the passenger seat of the Dodge and was within arm's reach of the methamphetamine. (Dingillo Decl. ¶ 5.) Based on the Court's holding in <u>Pringle</u>, officers had probable cause to arrest defendant, at a minimum, for the methamphetamine, as he had access to the methamphetamine and none of the occupants took responsibility for the methamphetamine.

**B.  February 7, 2022 Search of the Dodge Was Lawful**

　　1.  <u>Any Taint from the February 3, 2022 Search and Seizure Was Attenuated</u>

Even if this Court were to conclude that the original search of defendant on February 3, 2022 was invalid, the subsequent search warrant obtained in good faith and the additional investigation

1   sufficiently attenuated any taint such that the February 7, 2022

2   evidence, namely the 45 9mm rounds, are not subject to suppression.

3      The Supreme Court has recognized the attenuation doctrine as an

4   exception to the exclusionary rule: "Evidence is admissible when the

5   connection between unconstitutional police conduct and the evidence

6   is remote or has been interrupted by some intervening circumstance,

7   so that the interest protected by the constitutional guarantee that

8   has been violated would not be served by suppression of the evidence

9   obtained." Utah v. Strieff, 579 U.S. 232, 238 (2016) (quotations

10   omitted).  In determining whether the exception for attenuation

11   applies, courts consider three factors: the temporal proximity

12   between the unconstitutional conduct and the discovery of the

13   evidence, the presence of intervening circumstances, and the purpose

14   and flagrancy of the official misconduct.  Id. at 2062.

15      As to timing, the February 7, 2022 search of the Dodge pursuant

16   to a state search warrant took place four days after February 3,

17   2022.  This is a relatively lengthy period of time and weighs in

18   favor of attenuation.

19      There are also significant intervening circumstances in this

20   case.  First, the officers released the defendant from detention

21   after he was questioned.  See United States v. Washington, 387 F.3d

22   1060, 1074 (9th Cir. 2004) (listing release from custody as an

23   intervening circumstance).  Second, the following day, on February 4,

24   2022, in a recorded jail call with Lopez, defendant told Lopez that

25   the officers did not find the "extendis" and that they were still in

26   the Dodge.  (Def. Ex. C at 5.)  Third, based on the above-described

27   call, officers sought and obtained a warrant to search the Dodge, in

28   good faith, as analyzed below.

### 2. Good Faith Exception

Under the good faith exception to the exclusionary rule, suppression is not warranted when officers rely, in good faith, on an objectively reasonable warrant issued by a neutral and detached judge. United States v. Leon, 468 U.S. 897, 900 (1984). In Leon, the Supreme Court identified four circumstances where exclusion is appropriate, that is, where: (1) the issuing magistrate was misled by the inclusion of knowing or recklessly false information; (2) the issuing magistrate wholly abandoned the detached and neutral judicial role; (3) the warrant is so facially deficient as to its description of the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid; or (4) the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith. Id. at 923-26.

None of these circumstances apply here. Detective Espinoza gave a full and accurate description of what had occurred on January 31, 2022, February 3, 2022, and February 4, 2022, and defendant has not identified any material omissions. There also is no suggestion that the magistrate acted improperly or that the warrant was facially deficient. The warrant affidavit was also not so lacking in probable cause that a reasonably trained law enforcement officer would have considered it deficient. There should be no suppression of any physical evidence from February 7, 2022.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to suppress.

DECLARATION OF MICHAEL DINGILLO

I, Michael Dingillo, declare as follows:

1.    I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.  Because I am making this declaration for the limited purpose of addressing issues raised in defendant Juan Nicholas Benitez's ("defendant") motion to suppress, I have not included every fact known to me concerning this investigation.

2.    I have been employed as an Officer with the Los Angeles Police Department ("LAPD") since February 2018.  I am currently assigned to the Southwest Division, but on February 3, 2022, was assigned to the West Los Angeles ("WLA") Division.  As an Officer, I have assisted in over 25 investigations relating to carjacking.  I have made hundreds of arrests.  I have also made dozens of arrests of suspects who were armed.

3.    On February 3, 2022, my partner, Officer Cunningham, and I were working West L.A. Division.  We were both in full uniform and driving a marked black and white police vehicle.  At the beginning of our shift, and in preparation for a probation check at Marc Jesus Lopez's ("Lopez") residence, we were briefed that on January 31, 2022, a female had been carjacked by Lopez at gunpoint.  We were briefed that Lopez was armed and dangerous.  We were also provided a description and photo of Lopez.

4.    On February 3, 2022, at approximately 6:15 p.m., my partner and I, along with WLA's Gang Impact Team, conducted a probation compliance check at Lopez's residence.  A female resident refused to let officers inside of the residence to conduct the search.  The female resident repeatedly stated that Lopez was not home, and she

1   would not allow officers to go inside the residence. Due to the
2   circumstances, we decided to leave the residence but continued to
3   conduct patrol in the area.

4        5.   At approximately 7:05 p.m., Officer Cunningham and I were
5   conducting patrol in the area of Colby Avenue and Iowa Avenue. We
6   were driving westbound on Iowa approaching Colby Avenue when we
7   observed Lopez seated in the driver's seat of a black Dodge four door
8   sedan (the "Dodge"). The vehicle was also occupied by a male in the
9   front passenger seat (later identified as defendant) and a female in
10  the back seat of the vehicle (later identified as E.G.).

11       6.   I parked our black and white police vehicle behind the
12  Dodge and engaged my forward facing red and blue lights. Lopez then
13  suddenly exited the vehicle and began to approach our police vehicle.
14  Given our belief that Lopez was armed and had carjacked a female at
15  gunpoint, we immediately requested backup, an airship, and a
16  supervisor. Officer Cunningham ordered Lopez to get on his stomach,
17  but Lopez refused to comply with Officer Cunningham's order. Lopez
18  then told us to shoot him and dared us to shoot him.

19       7.   After Lopez refused to comply, Officer Cunningham
20  approached Lopez and put him on the ground. I then assisted Officer
21  Cunningham in handcuffing Lopez with one arm, and with my other arm
22  kept my firearm pointed at the Dodge because there were people still
23  in the vehicle. Based on my training and experience, I know that it
24  is possible for an armed suspect in a vehicle to pass a firearm to
25  other passengers in the vehicle to conceal or use the firearm.
26  Therefore, I believed that the passengers in the Dodge remained a
27  threat to the safety of officers, which is why I continued to aim my
28  firearm at the Dodge.

8.   A third officer, Officer Casey, assisted in handcuffing Lopez.  I reminded the officers that there were people still in the Dodge, and that Lopez was known to carry a firearm.  Lopez was then taken into custody.

9.   Officer Cunningham then ordered the male and female inside the Dodge to step out of the vehicle and lay on their stomachs with their arms and feet spread out.  E.G. stepped out of the Dodge first, followed by defendant, and both of them laid on their stomachs in the street.  Because we were aware that the residence to the right of where the Dodge was parked was Lopez's residence where we had previously been refused entry during our attempted probation search earlier that day, before we approached the Dodge, I requested that officers cover my right flank to watch Lopez's residence.  We then approached the vehicle with our firearms aimed at the Dodge and searched the vehicle to confirm there were no other occupants.  I then maintained a visual on Lopez's residence while holding up my firearm to protect the other officers.

10.  Defendant and E.G. were then detained pending further investigation.

11.  Officer Cunningham and I placed Lopez under arrest for carjacking in violation of California Penal Code § 215.

12.  Officer Jackson informed me that he had recovered two rounds of live ammunition from defendant's front left cargo shorts pocket.

13.  I confirmed with Detective Espinoza that Lopez was on probation and subject to search and seizure conditions.  I then conducted a probation search of the Dodge and found the following: (1) a plastic zip-loc bag containing 43.09 grams of suspected

3

methamphetamine located in the driver's door panel; (2) a 9mm Polymer 80 ghost gun with a black frame containing a Magpul-brand 9mm magazine with one round in the chamber and additional rounds in the magazine located underneath the driver's seat; (3) a 9mm Polymer 80 ghost gun with a black frame containing an ETS Group-brand 9mm magazine, with one round in the chamber and additional rounds in the magazine also located under the driver's seat; (4) a glass pipe with a bulbous end between the driver's seat and center console; (5) two baggies containing small amounts of suspected methamphetamine on the rear right floorboard; and (6) two rounds of 9mm ammunition inside the left pants pocket of a pair of jeans in the rear passenger seat.

14.  Lopez, defendant, and E.G. were then transported to WLA Station and interviewed by Detective Espinoza.

15.  Officer Cunningham and I were both in police uniform, equipped with body-worn video.  A true and correct copy of my body-worn video is attached hereto as Exhibit 1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on September **28**, 2023.

Michael Dingillo

# EXHIBIT 1

# (Video Filed Concurrently)

<u>DECLARATION OF YANNICK JACKSON</u>

I, Yannick Jackson, declare as follows:

1.   I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.  Because I am making this declaration for the limited purpose of addressing issues raised in defendant Juan Nicholas Benitez's ("defendant") motion to suppress, I have not included every fact known to me concerning this investigation.

2.   I have been employed as an officer with the Los Angeles Police Department ("LAPD") since August 2019.  On February 3, 2022, I was assigned to the West Los Angeles ("WLA") Division.  As an Officer, I have conducted over one hundred pat-down searches of suspects.

3.   On February 3, 2022, Officer Dingillo put out a request call for backup to assist him and Officer Cunningham with an incident approximately one block away from the WLA police station.  When I arrived, Officer Dingillo and Officer Cunningham, the primary officers, were pulling suspects, including defendant, out of a vehicle and handcuffing the suspects.

4.   The primary officers stated that the suspects, including defendant, were going to be taken to the WLA station.  An officer then passed defendant to me and I took the defendant to the side of my patrol vehicle.

5.   When I know that a suspect is going to be put into a patrol vehicle and taken to the police station, it is my practice to frisk the suspect to ensure that he does not have a weapon on him that could pose a threat to the safety of the officers in the vehicle, and to ensure that he does not have any narcotics on him.

6.   I then proceeded to frisk the defendant and in doing so felt ammunition in his front left cargo short's pocket.

7.   As an officer, I regularly deal with ammunition and carry it in my own pocket.  Because I have experience with carrying ammunition in my own pocket, I am familiar with the texture, shape, and feel of ammunition when it is in my own pocket.

8.   Based on my training and experience with ammunition in my own pocket, when I frisked the defendant's pocket, I was able to immediately recognize the ammunition in his front left shorts' pocket.  I then searched defendant's front left shorts' pocket and recovered two rounds of ammunition.

9.   After finding the ammunition in the defendant's pocket, to ensure the safety of the officers and the public, I then asked the defendant if there were firearms in the vehicle that he had just gotten out of.  The defendant then told me that there could be firearms in the vehicle.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on September 2?, 2023.

Yannick Jackson

2

1

**CERTIFICATE OF SERVICE**

2        I, Tania Godfrey, declare:

3        That I am a citizen of the United States and a resident of or

4    employed in Los Angeles County, California; that my business address

5    is the Office of United States Attorney, 312 North Spring Street, Los

6    Angeles, California 90012; that I am over the age of 18; and that I

7    am not a party to the above-titled action;

8        That I am employed by the United States Attorney for the Central

9    District of California, who is a member of the Bar of the United

10   States District Court for the Central District of California, at

11   whose direction the service by mail described in this Certificate was

12   made; that on September 29, 2023, I deposited in the United States

13   mail at the United States Courthouse in the above-titled action, in

14   an envelope bearing the requisite postage, a copy of:

15   No. 2:23-cr-00126-FLA-2
     GOVERNMENT'S OPPOSITION TO DEFENDANT JUAN NICHOLAS BENITEZ'S
16   MOTION TO SUPPRESS EVIDENCE AND STATEMENTS; DECLARATION OF MICHAEL
     DINGILLO; DECLARATION OF YANNICK JACKSON; EXHIBITS

17
     Placed in a sealed envelope for collection and mailing via United
18   States mail, addressed as follows:

19   **Holt Ortiz Alden**
     **Federal Public Defenders Office**
20   **321 East 2nd Street**
     **Los Angeles, CA 90012**
21

22   At his last known address, at which place there is a delivery service

23   by United States mail.

24       This Certificate is executed on September 29, 2023, at Los

25   Angeles, California.  I certify under penalty of perjury that the

26   foregoing is true and correct.

27                                        /s/

28                                        _____
                                          Tania Godfrey
                                          Legal Assistant